UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-20549-CR-SCOLA(s)(s)(s)

UNITED STATES OF AMERICA

vs.

ARNALDO CARMOUZE, *et al.*,

    Defendant.
_____/

## ARNALDO CARMOUZE'S RENEWED MOTION FOR COMPASSIONATE RELEASE

Mr. Arnaldo Carmouze, through undersigned counsel, and pursuant to 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018, renews his motion for compassionate release[1] based on changed circumstances and new developments, and in support states:

### BACKGROUND

On May 11, 2020, Mr. Carmouze filed a motion for compassionate release. DE 1496. The government responded to that motion on June 12, 2020. DE 1505. Three days later, this Court entered an order denying Mr. Carmouze's motion for compassionate relief. DE 1506. Based on changed circumstances and new

---

[1] Mr. Carmouze adopts and incorporates all facts and arguments advanced in his original motion for compassionate release, DE 1496, and all sealed appendices to his motion found in DE 1502, 1503 and 1504.

developments, Mr. Carmouze asserts that new facts and developments warrant this Court to revisit its prior order and grant his motion for compassionate release.

## ARGUMENT

As a preliminary matter, in this Court's order of June 15, 2020, the Court reasoned that Mr. Carmouze's motion should be denied because he had only completed less than 20% of his sentence and that he had not demonstrated that he would not be a danger to the community if released.

Regarding the amount of time Mr. Carmouze has served, it has naturally increased through the simple passage of time. Furthermore, Mr. Carmouze has participated in the RDAP program in BOP, which this Court ordered, and as a result his release date has been changed to February 2, 2024. *See* Arnaldo Carmouze's BOP Inmate Locater indicating a release date of February 2, 2024, attached as exhibit A. Mr. Carmouze has now served 19 months and has another 38 months to serve. As such, Mr. Carmouze has served 19 months of a 57 month sentence, or exactly 33%. In fact, he has probably served more of the incarcerated portion of the sentence since he will likely be released to a halfway house well before February 2, 2024.

Both the government's response and this Court's order put substantial emphasis on Mr. Carmouze's failure to demonstrate that he will not be a danger to the community if released. However, on June 19, 2020, shortly after this Court

issued its ruling on Mr. Carmouze's motion for compassionate relief, the Florida Board of Medicine revoked his license as a physician's assistant. *See* Florida Board of Medicine Revocation order attached as exhibit B. Mr. Carmouze had 30 days from that date to appeal that decision and he took no action, making his revocation final and permanent. Furthermore, Mr. Carmouze's Medicare billing number has also been revoked and he will forever be ineligible for reinstatement. Since Mr. Carmouze's offenses could only have occurred while he was a licensed physician's assistant with a Medicare billing number, he is utterly incapable of prescribing any medicine, necessary or otherwise. He cannot see patients or bill Medicare. In fact, his reputation is in tatters and he will never practice medicine in any way, shape or form. Therefore, Mr. Carmouze would pose absolutely zero danger to the community if he were released.

While neither the Court nor the government seemed to dispute that Mr. Carmouze had significant comorbidities that may constitute "extraordinary and compelling circumstances", Mr. Carmouze's health has only gotten worse in the intervening six months. He has developed diabetic neuropathy manifesting itself with extreme pain in both legs, a stabbing sensation in his thighs and numbness in his feet. For this condition Mr. Carmouze is prescribed Duloxetine 60 mg and Mobic 715 mg, daily. He also purchases Tylenol and Ibuprofen regularly from the commissary to assist with pain management. This development demonstrates that

his diabetes is advancing, despite the medical supervision at Miami FCI. Also, the physical, debilitating pain makes it that much harder to maintain any kind of social distancing, which is already a Herculean task in a custodial environment.

One circumstance that has not changed is that BOP in general, and Miami FCI in particular, are facing an unprecedented Covid-19 crisis that shows no sign of abating. FCI Miami Correctional Officer and Union President Kareen Trotino has stated "that prisoners and guards don't always find themselves on the same team; but in a pandemic, everyone's fates are intertwined. Prisoners were only getting tested if they had a fever — a testing threshold that hobbled the early months of the U.S. coronavirus response on the outside, before it spread to prisons. The virus has spread so efficiently through federal facilities because of inconsistent protocols that are almost always reactive rather than preventive. Inmates and staff, we do not feel safe".[2]

Another sign that BOP and Miami FCI do not have a handle on the spread of Covid-19 is the fact that in the face of staffing shortages Miami FCI and other BOP institutions have resorted to placing non-corrections officer staff in the role of guarding inmates and performing the traditional functions of corrections officers. This practice jeopardizes the safety of inmates and staff by placing untrained

---

[2] Kim Belware, Prisoners and Guards Agree about Federal Coronavirus Response "We Do Not Feel Safe", Washington Post (August 24, 2020) available at https://www.washingtonpost.com/nation/2020/08/24/prisoners-guards-agree-about-federal-coronavirus-response-we-do-not-feel-safe/ (last visited December 24, 2020).

individuals in positions that require extensive correctional officer training to maintain the orderly running of housing units and the entire facility. Miami FCI is experiencing staff shortages and utilizing "augmentation"; a practice within BOP by which employees typically assigned to other jobs are forced into correctional officer roles.

> "You can never accomplish your tasks, your primary goal of rehabilitation and meeting deadlines of GEDs and other vocational programs," said Kareen Troitino, a teacher at FCI Miami who has been primarily augmented to correctional officer duty since March.
>
> Employees blamed a combination of existing staffing shortages, workers getting sick or quarantining due to COVID-19 and an unwillingness by management to spend on overtime as responsible for the rising use of the reassignments. Troitino said his facility had gone on a hiring spree, bringing on more than 40 officers this year. Still, his Miami facility spent March through September on full augmentation, meaning education, construction and religious services were all shut down. Some activities have slowly resumed, but augmentation continues. Joe Rojas, who works at FCI Coleman in Florida, said his facility has never fully recovered from a bureau-wide hiring freeze instituted early in the Trump administration and fallout from the 35-day shutdown that began in 2018.[3]

Miami FCI is overwhelmed with the ramifications of this pandemic. Vulnerable persons like Mr. Carmouze are in grave risk of catastrophic health consequences.

Finally, the most recent development that changes the 18 U.S.C. § 3553(a) analysis that this Court must conduct in evaluating Mr. Carmouze's compassionate

---

[3] Eric Katz, Federal Prison Employees Fear Staff Shortages and Mass Reassignments as COVID-19 Cases Spike, Government Executive. (December 1, 2020) https://www.govexec.com/workforce/2020/12/federal-prison-employees-fear-staff-shortages-and-mass-reassignments-covid-19-cases-spike/170399/. (last visited December 24, 2020).

release motion is the decision by President Donald J. Trump to commute the sentence of Phillip Esformes. Section 3553(a)(6) provides that in imposing a sentence, the Court should take into account "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".

It is not necessary to belabor Mr. Esformes's role in this case. Without taking any position on the veracity of the government's assertions or the propriety of the jury's verdict, it is clear that Mr. Esformes was accused of defrauding Medicare for one billion dollars, a number so staggering that it defies comprehension. Furthermore, since Mr. Esformes's indictment the government busied itself asserting there was no wrongdoing Mr. Esformes did not commit, from bribery to criminal neglect to human trafficking. This Court sentenced Mr. Esformes to 20 years' imprisonment.

According to the government, Odette Barcha was at least as involved in the Esformes network fraud as Mr. Carmouze, and by some measures, was far more complicit in the fraud. By the government's own assertions at her detention hearing Ms. Barcha had perpetuated the Esformes network fraud from 2006 through the time of indictment.

> The last point I'll make to that is – and what I was going to say earlier was you have this 2006 settlement hanging out there; $15 million paid.  It is – it is related to this scheme, because at that point in time –
> THE COURT:  Just so I understand –

> MR. MEDINA: Yes, Your Honor.
> THE COURT: The settle between?
> MR. MEDINA: The settlement is between a hospital here in Miami, it is between Defendant Esformes, his father, Morris Esformes, the United States, and entities owned by Esformes. The reason that's an important piece in this case is that that [*sic*] is where an evolution in this fraud scheme occurred in the sense that he distances himself, and he puts in his place, as far as meeting with doctors and other people individually, people like Odette Barcha, who is also on tape, who is also on tape creating – backdating contract s related to a Miami-based hospital that were – that did not exist and that, on paper, would have been a cover-up to the extent a situation like this occurred.

DE 74:42. The Court sentenced Ms. Barcha to 15 months imprisonment, DE 1242, granting the government's motion to reduce her sentence for substantial assistance. Ms. Barcha surrendered to her facility on January 7, 2020. DE 1494:2. This Court granted Ms. Barcha's compassionate release motion over the government's objection on May 18, 2020, DE 1498, after she served about 4 months imprisonment, or just about a third of her sentence, which is precisely what Mr. Carmouze has served as of this filing. Ironically, while Mr. Carmouze does not wish to cast any aspersions on Ms. Barcha's character, if ***she*** were inclined to return to a life of Medicare fraud she could far more readily do so than Mr. Carmouze. Her role as a manager of a clinic, assisted living facility, or skilled nursing facility requires no special license or Medicare authorization, whereas Mr. Carmouze could never repeat the conduct that lead to his indictment in this case.

Several courts have considered the implications of unwarranted sentence disparities in granting compassionate release motions. In *United States v. Brown*, 457 F. Supp. 3d 691, 704 (S.D. Iowa 2020), the Court found that "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct … also cuts in favor of release. This is so because Defendant's codefendant was released two years ago and, aside from the § 924(c) counts, engaged in similar conduct." Similarly in *United States v. Adeyemi*, No. 06-124, 2020 U.S. Dist. LEXIS 117743 (E.D. Pa. July 6, 2020) the Court found that granting the defendant's compassionate release motion would "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." The Court based this conclusion on the fact that each of the defendant's three co-conspirators already completed his sentence. This case is particularly important in reconciling Ms. Barcha's sentence because the reason the co-conspirators received shorter sentences was due to their cooperation.

> Although they received significantly shorter sentences, they committed five additional robberies not attributable to Mr. Adeyemi. The co-conspirators brandished the firearm during the robbery while Mr. Adeyemi sat in the car. The co-conspirators also fled the scene of a robbery upon the arrival of the police; Mr. Adeyemi voluntarily went to the police station. Despite Mr. Adeyemi's comparatively low culpability, he received thirty-two years while the other men were sentenced to eight to ten years. Mr. Adeyemi's co-conspirators took plea deals, testified against Mr. Adeyemi at his trial, and received shorter sentences for doing so. The United States offered Mr. Adeyemi

>a plea deal which would have included "at least" the same cooperation agreement offered to his co-conspirators, indicating the United States did not believe Mr. Adeyemi deserved a longer sentence than the others.

*Id.* at *88-89; *see also United States v. Price*, No. 07-0152-06 (ESH), 2020 U.S. Dist. LEXIS 184784, at *16 (D.D.C. Oct. 6, 2020) ("Thus, as it now stands, both Anthony Suggs and Ernest Glover have been released from prison and Lonnell Glover is due to be released in 2025, while Mr. Price is still serving a life sentence. These unwarranted sentencing disparities provide a further compelling reason to reduce Mr. Price's sentence"). Clearly the shortened sentences **served** by Mr. Esformes and Barcha militate that Mr. Carmouze's motion for compassionate relief be granted.

Oliver Wendell Holmes observed that "Even a dog knows the difference between being kicked and being stumbled over." Similarly, one does not need a heightened sense of ethics, morality or propriety to see the injustice in Mr. Carmouze's continued incarceration in such vulnerable circumstances that his life is objectively subjected to extreme jeopardy while his codefendants, who are at least as culpable as he is, if not exponentially more so, ring in the New Year with their families. This is particularly so when his medical conditions, which are well established and beyond dispute, create a palpable and tangible risk that he will not be released on his currently scheduled release date, but will rather die in prison. Mr. Carmouze pled guilty to the charges against him and accepted responsibility.

He is remorseful for his conduct and it is also a profound loss for him that he will never be able to practice medicine. However, what he did should not result in what is functionally a life sentence wherein he dies in prison and never again knows what it is like to be in the bosom of his family. Mr. Carmouze's wife, Estrella Moreno, remains devoted to him and if the Court were to grant this motion he would live with her at the address provided in his initial motion for compassionate release.

WHEREFORE, Mr. Carmouze respectfully requests that this Court grant his renewed motion for compassionate release, and that Mr. Carmouze's sentence be reduced so he may serve his sentence in home confinement.

Respectfully submitted,

**do Campo & Thornton, P.A.**
Chase Bank Building
150 S.E. 2nd Avenue, Ste. 602
Miami, Florida 33131
Telephone: (305) 358-6600
Facsimile: (305) 358-6601

By:    s/ *Orlando do Campo*
       Orlando do Campo
       Florida Bar No. 0156582
       od@dandtlaw.com

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 88.9**

I HEREBY CERTIFY that undersigned counsel emailed government attorneys Elizabeth Young, James Hayes and Allen Medina on December 22, 2020, at 9:51 p.m. regarding the intention to renew Mr. Carmouze's motion for compassionate release, and requesting the government's position on the motion. As of the time of this filing, undersigned counsel has received no response.

s/ *Orlando do Campo*
Orlando do Campo

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 24, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/ *Orlando do Campo*
Orlando do Campo
